**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| DEBRA FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  2:11CV503 -WHA |
| | ) | |
| AUBURN UNIVERSITY MONTGOMERY; | ) | (wo) |
| KATHERINE JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This cause is before the court on a Motion for Summary Judgment (Doc. #41) and an

Objection and Motion to Strike Affidavits and Other Evidence (Doc. #50) filed by Defendants

Auburn University Montgomery ("AUM") and Katherine Jackson.

Several Plaintiffs filed a Complaint in this court on June 24, 2011, alleging violations of

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, the Age Discrimination

in Employment Act ("ADEA"), and the Americans with Disabilities Act ("ADA").  The court

granted a motion to sever the various Plaintiffs' claims, and then ruled on subsequent Motions to

Dismiss filed by AUM.  As a result of those rulings, this case is proceeding on claims brought by

Debra Foster under Title VII for hostile work environment (Count I), race and gender

discrimination (Count II), and retaliation (Count III) against AUM, and race discrimination under

42 U.S.C. § 1981 against Defendant Katherine Jackson ("Jackson").

For the reasons to be discussed, the Motion for Summary Judgment is due to be

GRANTED, and the Motion to Strike is due to be DENIED in part, GRANTED in part, and

DENIED as moot in part.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and  . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A),(B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*,

477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

### III. FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movant:

Debra Foster ("Foster") is an African-American woman who was hired by AUM in 2001. She was hired by Jacqulyn Roberts ("Roberts"), then Vice Chancellor for Financial and Administrative Services.  Foster was employed at AUM as the Senior Director of the Office of Human Resources.

Under AUM's equal employment policy, employees who felt they had been discriminated against or harassed could complain to their supervisor, or directly to Foster, as the head of Human Resources.

In February 2008, Foster received a written Final Reprimand after an audit by the Office of Federal Contract Compliance Programs revealed that she had failed to implement and maintain an Affirmative Action Program for AUM.  The reprimand warned her that any other performance related issue could result in further disciplinary action or termination.  Foster refused to sign the reprimand because she had not been told that an Affirmative Action Plan was a priority.  Foster's supervisor at the time, Roberts, did not agree with the issuance of the reprimand, but issued it at the request of AUM Chancellor John Veres ("Veres").  Foster had previously received only favorable performance reviews from Roberts.  After Foster became

aware of the Affirmative Action Program requirement, she worked diligently to prepare one.

In July 2008, Dr. Katherine Jackson ("Jackson") became Foster's supervisor.  Jackson is a white woman.  Foster asserts that she was subjected to a racially hostile work environment by Jackson.  Jackson's office was not located on the campus with Foster, but was instead located in downtown Montgomery, Alabama.  In her affidavit, Foster states that she and AUM employee Alecia Cyprian ("Cyprian") were subjected to racial discrimination by Jackson which, when brought to Jackson's attention in the Fall of 2008, only increased.  Foster states that she was required to meet with Jackson more than white employees were, and she was accused of false conduct and Jackson refused to allow her to establish the falsity of accusations.

In January 2009, Jackson performed a mandatory annual review of Foster's performance and rated her performance as "below expectations."   Foster was placed on a performance improvement plan.

On March 5, 2009, Foster wrote a letter to Veres complaining of a racially hostile work environment.  AUM hired Christine Sims to investigate Foster's complaint.  As a result of Sims's investigation, Veres found no basis for disciplining Jackson in response to Foster's complaint.  Foster challenges the adequacy of Sims's investigation.

In May 2009, Jackson discovered that Foster had a practice of changing her leave request forms after they had been approved by Jackson.  Foster has explained that her previous supervisor, Roberts, was aware of alterations made to her leave slip when Foster worked from home or on vacation during scheduled leave.

AUM has presented evidence that Foster's supervisor, Jackson, consulted with Veres and then asked two Vice Chancellors to investigate whether Foster had committed a Group I offense

under § 7.13 of the AUM Personnel Policies and Procedures Manual.   Group I violations are punishable by immediate termination. The two Vice Chancellors were Carolyn Golden ("Golden") Vice Chancellor for Advancement, and Keivan Deravi ("Deravi") the interim Vice Chancellor for Academic Affairs.   Deravi and Golden met with Foster.  The violations discussed during the meeting included the following:

1.  Changing leave slips after they were signed by the supervisor without the knowledge or approval of the supervisor.

2.  Breaching confidentiality of personnel information in the Office of Human Resources.

3.  Gross negligence in the performance of duties, such as: a. allowing conflicts of interest, and communicating outside the scope of her duties with an employee about a lawsuit filed by a terminated employee, b. instructing employees complaining of harassment to submit anonymous complaints, c. failure to prepare an affirmative action plan in a timely manner for which she received a written Final Reprimand, and d. performing the duties of her office in an unacceptable manner as indicated by the "below expectations" she received on her annual evaluation.

(Doc. #42-1 Ex. #10).

During the meeting with Deravi and Golden, Foster informed them that her previous supervisor allowed for changed leave slips and that she stopped doing it when told to do so by Jackson, she denied breaching confidentiality, she said she remained neutral and did not have a conflict of interest, she said she did not see a problem with telling campus police officers to submit an anonymous complaint to Jackson, and she explained that she had been told by the previous Chancellor that the Affirmative Action Program was not a priority.   After the meeting,

Deravi and Golden recommended that Jackson terminate Foster.

AUM has provided evidence of a July 2009 letter from Jackson to Foster in which she stated that she considered the recommendation of Golden and Deravi, her weekly meetings with Foster in which they discussed her performance, her observations of Foster's performance, reports from the personnel in the Human Resources office, and the best interest of AUM, and had decided to terminate Foster's employment. (Def. Ex. #13 to Foster Dep.). In her letter, Jackson states that Deravi and Golden gave Foster a chance to respond to the charges, but Foster chose not to discuss the matter fully, but instead denied there was a problem with the first two charges, and told Deravi and Golden to mail a termination letter to Foster. (*Id.*).

Foster challenges her termination as discrimination on the basis of her gender and race, as well as retaliation for her complaint of racial harassment.

## IV. DISCUSSION

In response to AUM's Motion for Summary Judgment, Foster asserts that she was subjected to racial harassment, and that she was terminated for complaining about harassment and because of her race. The court will address AUM's grounds for summary judgment as to each of these claims, beginning with Foster's claim for racial harassment.

### A. Racial Harassment

Racial harassment in which no adverse "tangible employment action" is taken, but which is sufficient to constructively alter an employee's working conditions, is actionable under Title VII. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). To prove racial harassment a plaintiff must show that (1) he belongs to a protected group, (2) he has been subject to unwelcome harassment, (3) the harassment has been based on a protected characteristic, (4) the

harassment is sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment, and (4) the employer is responsible for the environment under a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Foster identifies incidents of conduct she identifies as racial harassment.   Much of the evidence to support the incidents is objected to by AUM on various grounds.   One ground of objection by AUM is that Foster, and others, have referred to incidents in affidavits which are hearsay or not based on personal knowledge.   The court will, however, consider evidence of conduct "learned of through hearsay" so long as Foster has presented evidence that she was aware of the incidents during her employment, and the Motion to Strike is due to be DENIED to that extent.   *See Melton v. Nat'l Dairy LLC,* 705 F. Supp. 2d 1303, 1341 (M.D. Ala. 2010).

Foster has pointed to conduct and comments, which she contends were acts of racial harassment, including AUM employee Beasley Singleton ("Singleton") complaining to Foster that Darryl Morris, his supervisor, referred to him as "Do Boy" or "Boy" on "numerous," but unspecified occasions;[1]  Foster's relaying Singleton's complaint to Wanda Blake without result;[2]

---

[1] In an unpublished opinion, the Eleventh Circuit affirmed a district court's grant of summary judgment where a plaintiff testified that he was called "boy" "constantly," but could only recall eight specific instances over the course of two years where he was called that term. *Alexander v. Opelika City Schools*, 352 F. App'x 390, 393 (11th Cir. 2009).

[2] Johnny Potts has referred in an affidavit to the "Boy" comment, but has also stated that white employees called African-American employees degrading names and nothing was ever done.  The latter statement is subject to AUM's Motion to Strike as being beyond personal knowledge.  Because only the "Boy" statement has been shown to have been made known to Foster, and not the other comments Potts refers to, the court will not consider his statement about additional comments, and the Motion to Strike is due to be DENIED as moot as to that statement, for purposes of the hostile environment claim.

on an unrelated occasion, Wanda Blake saying that no African-American should make $95,000; Janet Warren instructing Cyprian that she was hiring too many African Americans; Adrienne Giles receiving mail at AUM which stated "we do not like blacks here;"  Adrienne Giles being required to use a time clock while white employees were not;[3] campus police making complaints of race discrimination to Foster and Jackson taking over the investigation; three employees in the registrar's office complaining about white supervisors receiving special accommodations; Jackson requiring African-Americans, including Foster, to attend weekly meetings that white employees were not required to attend; during weekly meetings African-Americans being patronized and falsely accused of conduct; Cyprian asking to file a grievance and complaining of being accused of altering evaluations while Jackson committed the same conduct without discipline; Judith Hagan being permitted to sleep on the job and to arrive late or leave early while African-Americans were not; Jennifer Brown, Kathy Mitchell, Jackson, Tami Wallace, Kathy Gunter, and Steve Crotz, not being disciplined even though they had performance issues; Valerie Samuel complaining to Foster that Jackson told others she did not know how to perform her job; Lakeisha Harris complaining to Foster about mistreatment; police officers complaining to Foster; the Vice Chancellor not being disciplined for hiring someone without the State's approval; Jackson's being involved in the investigation of Foster's complaints and other complaints; Jackson's inquiry into Foster's leave; and Foster's and other African-Americans receiving less pay than white employees.  (Doc. #48 at p. 11-18, 34-47).   Finally, Foster points to the EEOC charges and allegations of other employees to demonstrate that her perception of a hostile

---

[3] AUM has moved to strike Adrienne Giles's statement in her affidavit that she is the only African-American secretary required to punch a time clock as being based on speculation and conjecture. The court will consider the statement to the extent it is based on personal knowledge.

environment was reasonable.  (*Id.* at p. 41-48).

AUM argues that Foster cannot establish that this conduct she experienced was sufficiently severe or pervasive to constitute racial harassment.  The severe or pervasive nature of harassment is established if a plaintiff shows that she subjectively perceived the working environment to be abusive, and that a reasonable person would view the environment as hostile and abusive.  *Miller*, 277 F.3d at 1276; *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 19–22 (1993).

The court turns first to the subjective inquiry.  In the letter of complaint Foster wrote in March of 2009, she stated "I don't have any specific examples of things that have been said to me or done that I can say were based on my race."  (Pl. Ex. #10).  She also stated that she had not really thought of conduct as racial until recently when she "started looking at the list of people who have come to my office to complain, and they are all black.  It made me think that maybe there is something more to what they are saying."  *Id.*   Although weak, this evidence may support a finding of subjective harassment, so the court turns to the objective inquiry.

In evaluating the objective severity or pervasiveness of harassment, the court considers: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  *See Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997).

As pointed out by AUM, this case presents a somewhat unusual circumstance in that a substantial portion of the conduct upon which Foster relies to support her claim, including comments of an arguably racial nature, was made known to her because people complained to

9

her in her capacity as the Senior Director of Human Resources Department.  Although AUM has argued that conduct made known through formal complaint channels cannot contribute to the creation of a hostile environment of a human resources employee to whom the complaints were made in an employment capacity, AUM has not cited any authority for that proposition.  In the Eleventh Circuit, "[a] plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at her."  *See Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir.1995).  Therefore, the court will consider all of the admissible evidence pointed to by Foster, but, in doing so, will bear in mind the context of conduct made known through complaints in evaluating severity or pervasiveness.

It is a "bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir.2010) (en banc).  To constitute harassment, racial comments must be so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir.1990).  The few race-based comments set forth above while inappropriate, do not rise to that level.  The comments are not frequent.  *Compare Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1249 (11th Cir.1999) (finding five instances of conduct over eleven months too infrequent); with *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (stating that fifteen instances in four months was frequent).  The court is mindful, of course, that there is "not simply some magic number of racial or ethnic insults" that preclude summary judgment, and instead that "it is repeated incidents of ... harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." *Miller*, 277 F.3d at 1276.   The

comments pointed to in this case, however, which were directed at others and not Foster, also are not severe or threatening.

Some other incidents of conduct, such as weekly meetings required of Foster but not white employees, are perhaps frequent, but also not severe, humiliating, or physically threatening.

The conduct and comments pointed to by Foster also have not been shown to have unreasonably interfered with her job performance.   Particularly with regard to the comments and conduct made known to Foster as part of her job, the comments and conduct have not been shown to have unreasonably interfered with her job performance, because receiving those complaints was part of her job duties.  (Doc. #42-1 at p.30:1-6).[4]

Considering together all of the comments and conduct outlined above, under the totality of the circumstances, the evidence fails to create a genuine issue of fact as to whether Foster suffered racial harassment which was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment.[5]  *See Cyprian v. Auburn Univ. Montgomery*, 799 F. Supp. 2d 1262, 1277 (M.D. Ala. 2011) (stating that evidence that the plaintiff was aware of the use of "Do Boy," aware of a racially-based salary

---

[4] Foster's evidence that Jackson involved herself in the investigation of complaints may have been perceived by Foster as impeding her job performance as to those job duties, but there is no evidence that this conduct by Jackson was race-based conduct, or that it unreasonably interfered with Foster's job performance overall.

[5] Foster also disputes the adequacy of AUM's investigation of her complaints.  Although not referred to by the parties by name, AUM has invoked the *Faragher/Ellerth* affirmative defense.  (Doc. #28 p.27, #43 at p.35).  AUM has also moved to strike some of Foster's affidavit statements about the investigation.  Because the court has concluded that there is insufficient evidence of a hostile working environment, the court will not address these issues.

comment by Wanda Blake, aware of a note saying "we do not like blacks here," was told she was hiring too many African-Americans, and evidence that AUM required African-Americans to participate in more frequent meetings, AUM expected different behavior of white employees, and influenced the investigations of racism, even in light of EEOC charges of other employees, was not severe and pervasive harassment).

### B.  Disparate Treatment

Foster brings Title VII race and gender disparate treatment claims against AUM, and seeks to hold Jackson individually liable for race discrimination under 42 U.S.C. § 1981.[6]

Foster argues in her brief that she has direct evidence of discrimination.  The Eleventh Circuit has held that "[d]irect evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption. Therefore, remarks by non-decision makers or remarks unrelated to the decision making process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998) (citations omitted).   Foster, however, has merely stated in her brief that she has presented evidence of a racial motivation on behalf of Veres, Jackson, and Blake.   She has not pointed to evidence of decisionmakers' intent with respect to her termination or any other employment action taken with respect to Foster.   She has not, therefore, presented a direct evidence case of discrimination.

Even in the absence of direct evidence, Foster can seek to establish a disparate treatment claim through circumstantial evidence.   Where, as here, the plaintiff seeks to prove intentional

---

[6] AUM points out that a 42 U.S.C. § 1981 claim must be asserted through 42 U.S.C. § 1983. *See Butts v. Co. of Volusia*, 222 F.3d 891, 892 & n.1 (11th Cir. 2000).

discrimination by using circumstantial evidence of intent, the court applies the framework first

set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973).  Under this framework, the plaintiff must establish a prima facie case of discrimination.

*McDonnell Douglas*, 411 U.S. at 802.  After the plaintiff has established a prima facie case of

discrimination, the burden of production is placed upon the employer to articulate a legitimate

nondiscriminatory reason for its employment action.  *Texas Dep't of Cmty. Affairs v. Burdine*,

450 U.S. 248, 254 (1981).  The plaintiff may seek to demonstrate that the proffered reason was

not the true reason for the employment decision "either directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence."  *Id.* at 256; *Combs v. Plantation

Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).  A plaintiff's prima facie case, combined with

sufficient evidence to find that the employer's asserted justification is false, may permit the trier

of fact to conclude that the employer unlawfully discriminated.  *Reeves v. Sanderson Plumbing

Prod., Inc.*, 530 U.S. 133, 147 (2000).  That is, even if a plaintiff establishes a prima facie case

and offers sufficient evidence of pretext as to each of the proffered reasons, summary judgment

"will sometimes be available to an employer in such a case."  *Chapman v. AI Transport*, 229

F.3d 1012, 1025 n.11 (11th Cir. 2000).

### 1.  Discrimination in Salary on the Basis of Race and Gender

AUM moved for summary judgment on race and gender disparate treatment claims based

on Foster's salary and a 2009 performance evaluation.  In her response brief, Foster does not

address these claims.  There is a discussion in Foster's brief about Foster complaining to Jackson

that her salary was too low compared to the market, but no separate claim has been argued in

opposition to the summary judgment motion, nor evidence pointed to, based on salaries relative

to other employees at AUM.  Therefore, to the extent that Foster ever intended to assert such a

claim or claims, the court finds those claims to have been abandoned.  *See Resolution Trust*

*Corp. v. Dunmar Corp.*, 43 F.3d 587 (11th Cir.1995); *Road Sprinkler Fitters Local Union No.*

*669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994).

>    2.  Discrimination in Termination on the Basis of Race and/or Gender

Under the circumstantial evidence burden-shifting method of proof, a discriminatory

discharge claim requires a showing that the plaintiff (1) is a member of a protected class, (2) was

qualified for the job from which she was discharged, (3) was discharged, and (4) was replaced by

someone outside the protected classification or was treated less favorably than a similarly

situated individual outside her protected class.  *See Maynard v. Bd. of Regents*, 342 F.3d 1281,

1289 (11th Cir. 2003).

AUM concedes for the limited purpose of the summary judgment motion that Foster was

qualified for her position, as well as being a member of a protected class who was discharged.

AUM contends, however, that Foster cannot establish the fourth element of her prima facie case.

AUM contends that Foster cannot establish that she was replaced by someone outside of her

protected class because her successors were Cassandra Tarver Ross ("Ross") and Jeannine

Boddie-Lavan ("Boddie-Lavan"), both of whom are African-American women.  AUM has

provided the affidavit of Boddie-Lavan in which she states that Foster's position was filled first

by Ross and then by Boddie-Lavan.  Boddie-Lavan Aff. at ¶ 5.

Foster argues that she was replaced in part by Brad Robbins and Jamie Andress,[7] who are white employees, not Ross and Boddie-Lavan.  In support of this argument, she cites a statement in her own affidavit in which she states that Robbins and Andress now perform many of Foster's previous job's duties.  (Doc. #49-1 at ¶49).  This paragraph is subject to the Motion to Strike by AUM on the basis that Foster does not have personal knowledge of the persons currently performing her former job duties.  Therefore, before proceeding with this claim, the court must address the admissability of Foster's evidence.

Foster's affidavit statement is that two white employees "now perform many of my previous job duties." (*Id.*). In opposing the Motion to Strike, Foster merely states that specified paragraphs are not based on hearsay, but are information gained through the exercise of her own senses.  She does not, however, explain, or point to any evidence to support, that she personally witnessed the performance of her former job duties after her termination.  Therefore, the Motion to Strike is due to be GRANTED as to ¶ 49 of Foster's Affidavit.

Foster has also argued in her brief that AUM's argument that she was replaced by an African-American is not completely accurate because Jackson, a white person, assumed much of the Senior Director administrative duties.  Her support for this argument, however, is a reference to two paragraphs in her affidavit in which she describes Ross's and Boddie-Lavan's lack of qualifications to be Director of Human Resources and employment records from the City of Auburn for Ross.   The affidavit paragraphs are also subject to AUM's Motion to Strike.  Even

---

[7] The brief actually states that Cyprian was replaced by Brad Robbins, but the court assumes that this was a typographical error.  The court further notes that in support of this argument, Foster cites a paragraph of her own affidavit which is unrelated and does not support her argument, but that the paragraph preceding the one cited refers to Robbins and Andress. Therefore, the court has considered that paragraph.

considering Foster's evidence of her own evaluation of Ross's and Boddie-Lavan's qualifications, such evidence does not create a material issue of fact, in light of AUM's affirmative evidence, as to whether Ross and Boddie-Lavan in fact replaced Foster.   In other words, even though Foster's opinion may be evidence that Ross and Boddie-Lavan were not qualified to replace Foster, that does not create a question of fact as to whether they in fact replaced Foster.  AUM's evidence is to the contrary, and Foster has failed to create a genuine issue of fact.

Without evidence to create a question of fact as to whether Ross and Boddie-Lavan replaced her, Foster has failed to establish a prima facie case of disparate treatment in termination based on a theory that she was replaced by persons outside of her protected group.

AUM also disputes that Foster can establish a prima facie case of disparate treatment under the alternative formulation of the prima facie case; namely, that (1) the plaintiff is a member of a protected class; (2) she has engaged—either (a) disputedly or (b) admittedly—in misconduct similar to persons outside the protected class; and (3) that similarly situated employees outside plaintiff's protected class received more favorable treatment. *Jones v. Bessemer Carraway Medical Ctr.*, 137 F.3d 1306, 1311 n. 6 (11th Cir.1998), *reh'g denied and opinion superseded in part*, 151 F.3d 1321 (11th Cir.1988); *Maynard*, 342 F.3d at 1289.

AUM argues that Foster cannot establish that she was treated less favorably than people outside of her protected classes because she cannot show that there was a similarly-situated comparator who was treated more favorably.   As noted earlier, Deravi and Golden discussed possible Group I violations with Foster, and ultimately recommended that Jackson terminate Foster.  AUM contends, therefore, that to show that an employee was similarly-situated to Foster,

16

she would have to point to an employee who had received a prior written Final Warning, falsified University records, breached confidentiality of personnel information, failed to respond appropriately to complaints, received a "below expectations" in performance evaluation, and had conflicts of interest.

Foster's argument in her brief that she was treated differently from similarly situated employees is that she was an "exempt salaried employee," so the satisfaction of the similarly situated requirement requires that she compare herself to other "exempt salaried employees." (Doc. #48 at p.58). Foster cites no authority for this argument.[8] Foster seeks to compare herself to Steve Crotz, Elizabeth Ward, Jennifer Brown, Kathy Mitchell, Tami Wallace, Katherine Jackson, Wanda Blake, Darryl Morris, Susan Salter, Janet Warren, and Melinda Kramer. (*Id.* at p.63). All of these employees are white; some of them are men, but that also is not sufficient to establish a prima facie case.

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997). Under Eleventh Circuit law, "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *McCann v. Tillman*, 526 F.3d 1370,

---

[8] The court notes that in the context of arguing that the articulated reasons for her dismissal are pretextual, Foster disputes that she committed the conduct with which she was charged. For example, she has pointed to evidence that the conduct was allowed by her previous supervisor. She does not argue, however, and the law does not support an argument, that disputing that the conduct occurred could establish a prima facie case. *See Miller-Goodwin v. City of Panama City Beach, Fla.*, 385 F. App'x 966, 971 n.2 (11th Cir. 2010) (citing *Jones*, 137 F.3d 1311 n.6).

1373 (11th Cir. 2008) (citations and quotations omitted).

Foster sets out several pages of argument and evidence regarding alleged performance deficiencies of these other employees.  Foster begins by comparting Cyprian to Jackson and stating that Cyprian was held to a higher standard than Jackson.  That does not establish that anyone is a comparator with Foster, the Plaintiff, however.  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir.2008) (stating that  "[a] comparator is an employee similarly situated to the plaintiff in all relevant respects.").

Foster has identified Steve Crotz, Athletic Director, as having negative relationships and being inappropriately expressive and sarcastic.  She supports this comparison with her own affidavit.  Foster has also identified some comparators whom she states should have been disciplined by Jackson.  Kathy Gunter did not attend mandatory training and Jackson did not punish her for not attending.  (Doc. #49-1 at ¶ 42).  She also states that Janet Warren failed to follow faculty handbook policy in 2008 and was not investigated or reprimanded. (*Id.* at ¶ 33). Melinda Kramer is identified by Foster as having had complaints of racism against her, but she has not been disciplined.  Elizabeth Ward is said by Foster to have been unprofessional, negative and disruptive.  Foster states that Jennifer Brown is negative toward her colleagues, and Kathy Mitchell lacks interpersonal skills, as does Darryl Morris ("Morris").  Foster also states that Morris disclosed confidential information.  Foster states in her affidavit that Wanda Blake made a racist statement about salaries and Susan Salter failed to complete a job task, all without being terminated.  Much of this evidence is the subject of AUM's Motion to Strike.

Foster's argument is that AUM seeks to justify her termination on the basis that she lacked interpersonal skills, disclosed confidential information, was difficult to interact with,

18

failed to perform a task, and was disruptive, but the people pointed to also had these performance issues but were not disciplined or terminated.

Even accepting Foster's evidence as to these proffered comparators as admissible, and considering all of the evidence of the identified comparators, Foster's evidence is not sufficient to demonstrate that any of these comparators was similarly-situated in all relevant respects to Foster but not terminated.  The mere fact that other employees may have also had performance issues is not dispositive.   The degree to which a comparator had performance issues must be taken into account.  *See Knight v. Baptist Hospital of Miami*, 330 F.3d 1313, 1318 (11th Cir. 2003) (affirming a finding that plaintiff failed to establish a prima facie case where the plaintiff proffered a comparator who also had performance deficiencies but the plaintiff's "documented performance and tardiness problems were much worse . . . in both number and nature.").   Foster has not presented any evidence of comparators who had who received a "below expectations" on a performance review, received a written Final Reprimand, and had other Group I violations, but were not terminated.

Foster has pointed to evidence of one employee, Tami Wallace ("Wallace"), who was given a "below expectations" on a performance review by Jackson and was not terminated.  In her affidavit, Foster also states that Wallace failed to meet deadlines and was hostile and negative. (Doc. #49-1 at ¶ 41).   Wallace may bear more similarity to Foster than the other proffered comparators.  Wallace is not, however, similarly situated in all relevant respects. Foster's reliance on Wallace's hostility and negativity does not establish similarity, because the record evidence does not support that Foster was terminated for being negative or hostile.   The court also has not been pointed to evidence that Wallace was given a written Final Reprimand

19

before she was given a "below expectations" on her annual review.  While Wallace had one performance issue regarding deadlines, there is no evidence that she had several performance deficiencies, nor that they were those which Foster had, (Doc. #42-1 Ex. #10), including unauthorized alterations of leave slips, breaching confidentiality, and gross negligence in the performance of duties such as allowing conflicts of interest and telling employees to make anonymous complaints.  *See McCann*, 526 F.3d at 1372 (stating that the quantity and quality of the misconduct must be nearly identical).  Foster, therefore, has failed to identify any comparator who had the same quantity and quality of performance issues that Foster had.

Because she has failed to establish a prima facie case of disparate treatment, the court concludes that the Motion for Summary Judgment is due to be GRANTED as to the disparate treatment claims, and the court will not address Foster's arguments regarding pretext under the *Burdine* burden-shifting analysis.

## C.  Retaliation

To establish a prima facie case of retaliation, a plaintiff must show that she (1) engaged in statutorily protected activity, (2) the employer subjected her a materially adverse action, and (3) some causal connection between the two events.  *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010).

AUM concedes the first two elements of the prima facie case but argues that there is no causal connection between them.  Foster states that she complained in the Fall of 2008 and again on March 5, 2009 that her working environment was hostile.  It is undisputed that Foster was terminated on July 31, 2009, which was more than four months after her last complaint. AUM cites Eleventh Circuit precedent for the proposition that a three month period between a

protected activity and materially adverse employment action, standing alone, is too long to infer causation. *See, e.g., Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that three months between a protected activity and an adverse employment action, standing alone, failed to establish a causal connection of retaliatory discharge).

In response, Foster states that her termination was in "close proximity" to her complaints about the working environment, but cites no authority to support her argument. The only evidence she has referenced is a memorandum dated April 29, 2009. She argues that this memorandum is evidence that Veres was aware that Foster had made complaints which establishes causation.[9]   Even if the court were to consider April 29, 2009 as the date relevant for calculation of the time period between the protected activity and the materially adverse action, April 29 to July 31 is a period of three months, a period of time which, standing alone, the Eleventh Circuit has held is too long a period from which a reasonable jury could infer causation. *See Drago*, 453 at 1308.   In the absence of any other evidence of causation, summary judgment is due to be GRANTED as to the retaliation claim.

## V. CONCLUSION

For the reasons discussed, it is hereby ORDERED as follows:

1. The Motion to Strike (Doc. #50) is DENIED in part, GRANTED in part, and DENIED in part as moot as set forth above.

2. The Motion for Summary Judgment (Doc. #41) is GRANTED.

---

[9] Foster does not provide a citation to where this evidence is located in the record, and the court has not found it within her list of submissions.  The court is unaware, therefore, of the content of the memorandum, but assumes for purposes of argument that the memorandum is evidence of Veres's awareness of Foster's earlier complaints.

A separate Judgment will be entered in accordance with this Memorandum Opinion and Order.

Done this 19th day of November, 2012.

/s/ W. Harold Albritton
W.  HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE